26-3278

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

JACK GERRITSEN,

*Plaintiff-Appellant*,

HENRY FREDERICK RAMEY, JR.,

*Plaintiff,*

*v.*

CITY OF LOS ANGELES, a chartered city, and DOMENIKA LYNCH, as General Manager, El Pueblo Park,

*Defendants-Appellees*.

On Appeal from the United States District Court for the Central District of California, No. 2:25-cv-8760-RGK
Hon. R. Gary Klausner, District Judge

# PROPOSED INTERVENOR-DEFENDANT'S BRIEF OR ALTERNATIVELY PROPOSED BRIEF OF AMICUS CURIAE IN SUPPORT OF DEFENDANTS AND AFFIRMANCE

Andrea R. Butler
*Counsel of Record*
Eric S. Baxter
Daniel L. Chen
Colten L. Stanberry
Richard C. Osborne
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW
Suite 400
Washington, DC 20006
(202) 955-0095
*abutler@becketfund.org*

*Counsel for Proposed Intervenor-Defendant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

BACKGROUND .......... 2

A. El Pueblo as the historic heart of Los Angeles .......... 2

B. The Olvera Street Merchants Association Foundation .......... 9

C. Procedural Background .......... 15

STANDARD OF REVIEW .......... 16

ARGUMENT .......... 17

I. Gerritsen is not likely to succeed in showing that the cross and nativity violate the Establishment Clause. .......... 17

A. Gerritsen lacks standing as an offended observer. .......... 17

B. The cross and nativity are constitutional under a historical understanding of the Establishment Clause. .......... 21

1. The cross and nativity do not bear the historical hallmarks of a religious establishment. .......... 21

2. This result is consistent with *American Legion*. .......... 24

3. This result is consistent with *Town of Greece*. .......... 29

II. Gerritsen does not meet the remaining requirements for a preliminary injunction. .......... 33

CONCLUSION .......... 34

CERTIFICATE OF COMPLIANCE.......................................................35

CERTIFICATE OF SERVICE.............................................................36

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Legion v. Am. Humanist Ass'n*,
588 U.S. 29 (2019) .................................... 20, 24, 25, 26, 27, 28, 29, 33

*Bernhardt v. County of Los Angeles*,
279 F.3d 862 (9th Cir. 2002) .................................... 17

*City of Ocala v. Rojas*,
143 S. Ct. 764 (2023) .................................... 17, 19, 20

*County of Allegheny v. ACLU*,
492 U.S. 573 (1989) .................................... 27-28

*Drakes Bay Oyster Co. v. Jewel*,
747 F.3d 1073 (9th Cir. 2014) .................................... 33

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .................................... 22

*Firewalker-Fields v. Lee*,
58 F.4th 104 (4th Cir. 2023) .................................... 24

*Freedom From Religion Found. v. County of Lehigh*,
933 F.3d 275 (3d Cir. 2019) .................................... 29

*Freedom From Religion Found. v. Obama*,
641 F.3d 803 (7th Cir. 2011) .................................... 19

*Garcia v. Google*,
786 F.3d 733 (9th Cir. 2015) .................................... 17

*Gerritsen v. City of Los Angeles*,
994 F.2d 570 (9th Cir. 1993) .................................... 19

*Gerritsen v. City of Los Angeles*,
No. 25-cv-8760, 2026 WL 1454313
(C.D. Cal. May 14, 2026) .................................... 18

*Gerritsen v. Consulado General de Mexico*,
989 F.2d 340 (9th Cir. 1993) .................................................. 18

*Gerritsen v. L.A. Cnty. Metro. Transp. Auth.*,
No. 22-cv-6052, 2023 WL 6627823
(C.D. Cal. Sep. 21, 2023) .................................................. 18

*Groff v. DeJoy*,
600 U.S. 447 (2023) .................................................. 21

*Harris v. Muhammad*,
165 F.4th 1345 (9th Cir. 2026) .................................................. 16

*Hilsenrath ex rel. C.H. v. Sch. Dist. of Chathams*,
136 F.4th 484 (3d Cir. 2025) .................................................. 24

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) .................................. 20, 21, 22, 23, 24, 28

*Kondrat'yev v. City of Pensacola*,
949 F.3d 1319 (11th Cir. 2020) .................................................. 28

*Lemon v. Kurtzman*,
403 U.S. 602 (1971) .................................................. 20

*Lynch v. Donnelly*,
465 U.S. 668 (1984) .................................................. 28, 31-32

*Miller v. Gammie*,
335 F.3d 889 (9th Cir. 2003) .................................................. 28

*Nathan v. Alamo Heights Indep. Sch. Dist.*,
173 F.4th 576 (5th Cir. 2026) .................................. 22, 23, 24

*Perrier-Bilbo v. United States*,
954 F.3d 413 (1st Cir. 2020) .................................................. 29

*Perry v. Newsom*,
18 F.4th 622 (9th Cir. 2021) .................................................. 17

*Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*,
44 F.4th 867 (9th Cir. 2022) .................................................. 28

*Seattle Pacific Univ. v. Ferguson*,
104 F.4th 50 (9th Cir. 2024) .......... 17

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022) .......... 22, 23

*Town of Greece v. Galloway*,
572 U.S. 565 (2014) .......... 18, 21, 29

*Trunk v. City of San Diego*,
629 F.3d 1099 (9th Cir. 2011) .......... 28

*United States v. Gerritsen*,
571 F.3d 1001 (9th Cir. 2009) .......... 18

*Valley Forge Christian Coll. v. Ams. United for Separation of Church and State*,
454 U.S. 464 (1982) .......... 19

*Van Orden v. Perry*,
545 U.S. 677 (2005) .......... 29-30, 31

*Woodring v. Jackson County*,
986 F.3d 979 (7th Cir. 2021) .......... 28, 29, 32

**Other Authorities**

*About Us*, El Pueblo de Los Angeles .......... 2-3

*Annual Events*, Olvera Street Merchants Ass'n Found. .......... 12

Stephanie H. Barclay, *The Religion Clauses After* Kennedy v. Bremerton School District,
108 Iowa L. Rev. 2097 (2023) .......... 22

*Canby's Cross*, The Hist. Marker Database .......... 31

*Canby's Cross-1873*, Cal. Off. of Hist. Pres. .......... 31

Nathan S. Chapman & Michael W. McConnell, *Agreeing to Disagree: How the Establishment Clause Protects Religious Diversity and Freedom of Conscience* (2023) ....................22-23

*Columbus Doors*, Architect of the Capitol ....................30

*Cross Mountain Park*, City of Fredericksburg Parks & Recreation....................30

*Events*, El Pueblo de Los Angeles ....................14

Joseph C. Davis & Nicholas R. Reaves, *Fruit of the Poisonous* Lemon *Tree: How the Supreme Court Created Offended-Observer Standing, and Why It's Time for It to Go*, 96 Notre Dame L. Rev. Reflection 25 (2020) ....................20

*Discovery of the Mississippi by De Soto*, Architect of the Capitol....................30

*Details for Cross Mountain*, Tex. Hist. Sites Comm'n ....................30

*Determination of Eligibility Form*, Md. Hist. Trust ....................31

*History of El Pueblo*, El Pueblo de Los Angeles....................3, 8, 15

*Irish Brigade*, U.S. Dep't of War ....................30

*Kauhako Crater Cross*, Nat'l Park Service ....................31

*Los Angeles Plaza Historic District National Register of Historic Places Nomination Form*, Nat'l Archives Catalog (1972)....................34

Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105 (2003) ....................23

Michael W. McConnell, *Religious Freedom at a Crossroads*, 59 U. Chi. L. Rev. 115 (1992) .......... 28

*Olvera Street Cross*, The Hist. Marker Database .......... 4

*Olvera Street Cross*, The Huntington Digit. Libr. .......... 4

*Past Events*, Chinese Am. Museum .......... 14

Jean Bruce Poole & Tevvy Ball, *El Pueblo: The Historic Heart of Los Angeles* (2002) .......... 3, 8-9, 14

*San Buenaventura Mission Cross*, The Hist. Marker Database .......... 30

*Site of Junípero Serra's Cross*, Cal. Off. of Hist. Pres. .......... 30

*Taste of Italy*, Italian Am. Museum of Los Angeles .......... 14

*U.S. Naval Academy Cemetery*, U.S. Naval Academy .......... 31

*World War I-II Memorial*, The Hist. Marker Database .......... 31

## INTRODUCTION

El Pueblo de Los Angeles Historical Monument is steeped in the early history, tradition, and culture of the City of Los Angeles. Millions of visitors come to experience its vibrant community of traditional merchants, artisans, and restaurants along Olvera Street, its historical landmarks invoking the City's rich past, and its time-honored cultural events celebrating the City's Mexican-American heritage.

This appeal centers on two historic displays in the heart of El Pueblo: a 10-foot, hand-carved wooden cross erected in 1929 near the site of the City's 1781-founding and a life-size nativity displayed in El Pueblo's central gazebo every December that corresponds with Las Posadas—an annual celebration depicting Mary and Joseph seeking refuge at an inn.

Relying on the now-abandoned *Lemon* test, Appellant Jack Gerritsen claims that—because he is offended by these displays—they violate the Establishment Clause. But Gerritsen's constitutional claim is meritless. At the outset, his alleged offense at observing the displays is insufficient to create standing. Merely encountering a historic religious symbol in a public space is not a constitutional injury.

Further, both the cross and nativity are constitutional under the Supreme Court's *current* Establishment Clause precedent. Under the approach explained in *Kennedy v. Bremerton*, neither display resembles a historical hallmark of an established church—*e.g.*, they do not compel religious worship, dictate church doctrine, or punish dissent—meaning

there is no Establishment Clause violation. And since both the cross and nativity are long-standing displays—and hugely important to El Pueblo's historical heritage—they are presumptively constitutional under *American Legion v. American Humanist Association*. Gerritsen has not rebutted that presumption. Finally, this result is consistent with the Court's reasoning in *Town of Greece v. Galloway* because the displays fit within this country's long traditions of publicly displaying crosses and celebrating religious holidays, including Christmas.

Because Gerritsen cannot show he is likely to succeed on the merits of his Establishment Clause claim—much less any of the remaining injunctive factors—no injunction is merited.

## BACKGROUND[1]

### A. El Pueblo as the historic heart of Los Angeles

El Pueblo marks the birthplace of the City of Los Angeles. It sits near where Los Pobladores—the original 48 settlers from the Sonora and Sinaloa regions of New Spain (now Mexico)—built the original settlement that would grow into Los Angeles. *About Us*, El Pueblo de Los Angeles,

[1] Intervenor Olvera Street Merchants Association Foundation submits this proposed brief alongside a motion to intervene as a Defendant-Appellee or, in the alternative, to participate as an amicus. If the Court accepts the brief as an amicus brief, the Foundation states that no counsel for a party authored this brief in whole or in part, and no person other than Amicus, its members, or its counsel made a monetary contribution to fund the brief's preparation or submission. *See* Fed. R. App. P. 29(a)(4)(E).

https://perma.cc/76H2-9BY5; *see also* Jean Bruce Poole & Tevvy Ball, *El Pueblo: The Historic Heart of Los Angeles* 8-10 (2002), https://perma.cc/A8B5-KSE7. Today, El Pueblo has been preserved as a state historic park and is listed on the National Register of Historic Places. *History of El Pueblo*, El Pueblo de Los Angeles, https://perma.cc/G4S5-GRUK.

As just one part of El Pueblo's rich culture and history, a 10-foot wooden cross has stood at the head of Olvera Street—El Pueblo's commercial district—for nearly 100 years.



More than 2 million visitors each year come to El Pueblo to view the cross, tour the historic buildings, enjoy the Mexican food, and shop for the traditional crafts, leather goods, and folk art sold in the shops that line Olvera Street. *About Us*, El Pueblo de Los Angeles, https://perma.cc/76H2-9BY5.

The cross was first erected in 1929, commemorating the city's 148th birthday, and was replicated and replaced in 2017 due to weathering. *Olvera Street Cross*, The Hist. Marker Database, https://perma.cc/3G3E-ZZXR. The original cross bore an early version of the City's name: "El Pueblo de Nuestra Señora la Reina de los Angeles"; the name the city's founder: "Felipe de Neve"; and the founding date: "September Fourth 1781." *Olvera Street Cross*, The Huntington Digit. Libr., https://perma.cc/JX2B-37TB. The replacement is substantially the same.

The historical landmarks throughout El Pueblo tell much of the City's early history. The cross faces the Old Plaza—a large public square that formed the original center of Los Angeles. Stately 150-year-old Moreton Bay fig trees flank the square, with enormous Mexican-flag bunting draped around their bases.



Across the street to the south stands the Old Plaza Firehouse—the oldest fire station in Los Angeles—which today serves as a museum of firefighting.



And adjacent is the Pico House, a luxury hotel opened in 1870 to serve what was then a small town of fewer than 6,000 residents.



The cross is not the only religious structure in El Pueblo. One of the buildings adjacent to the cross is La Plaza United Methodist Church.



Around the corner to the west stands La Iglesia de Nuestra Señora la Reina de Los Àngeles, or the Old Plaza Church, the City's oldest Catholic church, founded in 1814.



Opposite the Old Plaza, Olvera Street stretches from behind the cross, with several historic buildings flanking the street on each side of the merchant shops that run through the middle. The Ávila Adobe—the oldest standing residence in Los Angeles (1818)—sits halfway down the street.




Across the way is the Pelanconi House, the oldest fired-brick building in the City.



By the early 1900s, Olvera Street and many of the surrounding sites were in significant disrepair. In November 1928, a young woman named Christine Sterling visited La Placita and was distressed to see a condemnation notice indicating the Ávila Adobe was scheduled for demolition. Sterling began raising money to purchase historic sites in El Pueblo to preserve the area's "Spanish and Mexican heritage." *History of El Pueblo*, El Pueblo de Los Angeles, https://perma.cc/G4S5-GRUK. Her fundraising to save the Ávila Adobe blossomed into a vision to restore and preserve the culture of El Pueblo. The original Olvera Street cross was erected in 1929 as part of these revitalization efforts.




Maria Gribbell and Albert Charles Gribbell, 1963

Part of Sterling's vision included creating a marketplace on Olvera Street featuring Mexican goods. Poole & Ball, *El Pueblo: The Historic*

*Heart of Los Angeles*, 53. Sterling personally recruited Los Angeles vendors with connections to Mexico to move their businesses to Olvera Street. *See* Decl. of Sylvia Gribbell ISO Mot. to Intervene ¶ 5. Despite the ongoing Great Depression, the marketplace allowed many members of Los Angeles' Mexican-American community to launch successful businesses as Olvera Street merchants. Poole & Ball, *El Pueblo: The Historic Heart of Los Angeles*, 53. Thanks in large part to Sterling and the original Olvera Street merchants, the area has become a significant symbol of Mexican-American culture in Los Angeles.

**B. The Olvera Street Merchants Association Foundation**

The Olvera Street Merchants Association Foundation is a nonprofit organization formed to "preserve and promote the traditional, historical, cultural, and educational events and programs that have taken place on Olvera Street for nearly 100 years." Decl. of Valerie Hanley ISO Mot. to Intervene ¶ 9. Its Board of Directors comprises merchants whose families have been part of the Olvera Street community since its inception in 1930. *Id.*

Valerie Hanley, the Board treasurer, is one of many merchants whose family has been part of the community since the market opened. Her father was recruited in 1930 by Christine Sterling to work as a shoeshine boy after Sterling encountered him selling vegetables on the street. *Id.* at ¶ 4. When Sterling later discovered Valerie's grandmother was single with three other children, Sterling invited her to become a merchant on

Olvera Street. *Id.* at ¶ 5. Valerie's grandmother borrowed a Mexican blanket and accepted several items from the existing vendors to start her business. *Id.* She eventually owned an Olvera Street kiosk where she worked until she passed away at age 98. *Id.* at ¶ 6.

Valerie's mother, Norma, came to Olvera Street in 1962 to work for the Latin America Trade Mart, a showcase for Latin American countries. *Id.* at ¶ 7. After Valerie's parents met and married, they purchased the old Olvera Street Theatre, which had been converted into a shop selling hand-blown glass from Mexico. *Id.* at ¶ 8. They converted the business into "Casa California" and introduced a broader range of goods. Valerie and her mother, along with Valerie's husband, continue to run Casa California today. *Id.*

Sylvia Gribbell also has a long family history on Olvera Street. Her ancestors came to California from Sonora in the early 1800s. Gribbell Decl. ¶ 3. One of her great-grandfathers was an established importer of Latin American goods in Los Angeles when Sterling persuaded him to move his business to Olvera Street. *Id.* at ¶¶ 4-5. Two of his daughters, including Gribbell's grandmother, carried on the tradition, each with their own shop. *Id.* at ¶ 5. Sylvia's parents, in turn, poured their retirement funds into the family's Olvera Street business. *Id.* at ¶ 7. Sylvia and her mother continue to operate their family kiosk, while her cousin runs a neighboring store. *Id.*

Edward Flores is a Foundation board member and the owner of Juanita's Café on Olvera Street. Decl. of Edward Flores ISO Mot. to Intervene ¶¶ 2, 5. His great-grandmother, Aurora Guerrero, opened the Cielito Lindo in 1934, which popularized Olvera Street's signature taquitos and remains in operation by members of Flores's family today. *Id.* at ¶ 3. Edward's grandmother, Juana Guerrero, opened Juanita's Café in 1944, and Edward began earning spending money by working in the café when he was twelve years old. *Id.* at ¶ 4.

Almost since its beginning, the Foundation has facilitated a wide range of events to help preserve the Mexican-American culture integral to the City's history. Hanley Decl. ¶¶ 9-10. The events also serve to attract tourists and customers to the Merchants' stores. *Id.* at ¶ 18. In early January, Olvera Street celebrates Día de los Reyes (Three Kings Day) with music and rosca (king cake). *Id.* at ¶ 11. A "Blessing of the Animals" takes place the day before Easter, with a Catholic Cardinal or Bishop providing the blessings. In 2025, more than 6,000 individuals participated with their pets. *Id.* at ¶ 13.






Other celebrations include a nine-day festival celebrating Día de los Muertos (Day of the Dead) in late October and early November. *Id.* at ¶ 14. And in late December, a nine-night procession called Las Posadas depicts the journey of Mary and Joseph to Bethlehem. *Id.* at ¶ 15. Throughout the Christmas season, a life-size nativity sits in the gazebo in the center of the Old Plaza. *Id.* at ¶ 16.



All the events incorporate cultural and educational elements, including traditional Aztec and Folklórico dancers, artisans, Mexican food, and pastries and chamurrado (Mexican hot chocolate), which Edward has long donated to support the public events.[2] *Id.* at ¶ 17; Gribbell Decl. ¶ 9; Flores Decl. ¶ 6.

[2] *See Annual Events*, Olvera Street Merchants Ass'n Found., https://perma.cc/LSL4-UFYZ.








These events hold deep cultural significance for the Foundation and its members. Sylvia, for example, though religiously agnostic, understands the importance of cultural representation, community, and family. Gribbell Decl. ¶ 8. In the Olvera Street celebration of Día de los Muertos, she sees the Mexican influence in Los Angeles's history and its culture of honoring generations across space and time. For her, the preservation of culture through multiple generations of families at Olvera Street can resonate for all of humanity. *Id.* Edward, for his part, sees the events as a way to preserve El Pueblo's Mexican-American heritage and culture, connect to the historical founding of the City, and to maintain the tight-knit community that has grown up around Olvera Street over the decades. Flores Decl. ¶ 7. Even as the finances for Olvera Street

merchants become more challenging, merchants like Valerie, Sylvia, and Edward all seek to preserve El Pueblo's unique history and culture.

Beyond those events hosted by the Foundation, El Pueblo is home to numerous other cultural events throughout the year. There are celebrations for Cinco de Mayo in the spring and Fiestas Patrias (Mexican Independence Day) in the fall. *See Events*, El Pueblo de Los Angeles, https://perma.cc/C8TN-MMEU. And other communities host cultural events celebrating their own unique cultures and ties to El Pueblo. Gribbell Decl. ¶ 9. For example, the Chinese American Museum, in conjunction with the City, hosts an annual spring festival celebrating the Chinese lunar year, which is free and open to the public. *See Past Events*, Chinese Am. Museum, https://perma.cc/6KCW-SBVZ. And the Italian American Museum has previously hosted a Taste of Italy event to fundraise for community education programs and to celebrate the community's connection to El Pueblo—which was once also "the heart of the city's Italian enclave." *Taste of Italy*, Italian Am. Museum of Los Angeles, https://perma.cc/4J3Y-XQA2.

The state, county, and city likewise value El Pueblo and its environs for the preservation of history and culture. Thanks to the early efforts of Christine Sterling and the original Olvera Street merchants to restore the area, in 1953 the area was designated El Pueblo de Los Angeles Historic State Park. Poole & Ball, *El Pueblo: The Historic Heart of Los Angeles*, 55. In 1972, El Pueblo was added to the National Register of

Historic Places, recognizing the historic significance of Olvera Street, the Old Plaza, and the surrounding buildings. *History of El Pueblo*, El Pueblo de Los Angeles, https://perma.cc/G4S5-GRUK.

### C. Procedural Background

Plaintiffs Jack Gerritsen and Henry Frederick Ramey Jr. sued the City of Los Angeles and Domenika Lynch, the General Manager of El Pueblo, alleging several violations of their First Amendment rights and seeking $5 million in damages. 1-ER-60–78.

As relevant to this appeal, Plaintiff Gerritsen alleged Defendants violated the Establishment Clause of the First Amendment in two ways: by displaying "a cross at the South entrance of Olvera Street," and by "put[ting] up a Nativity display on the El Pueblo Park kiosko." 1-ER-73. Gerritsen moved for a preliminary injunction against the displays on the grounds that the nativity "offends [him] and makes [him] feel excluded as a non-believer" and that he views the cross "as a Christian endorsement on public land." 1-ER-57.

The district court denied Gerritsen's request for an injunction. As to the cross, the court determined because it was erected almost a century ago, it met *American Legion*'s "presumption of constitutionality" as "established" and "longstanding." 1-ER-6–7. Plaintiffs presented "no evidence" suggesting that the cross "was maintained with discriminatory intent or that it conveys 'deliberate[] disrespect[]' on the basis of religion," and it accordingly does not violate the Establishment Clause. 1-

ER-7. As to the nativity, the court determined there was insufficient evidence that the nativity was long "established," so no *presumption* of constitutionality applied. *Id.* However, looking to "the historical practices and understandings analysis mandated by *Kennedy*," the nativity "fits within a longstanding tradition of religious expression in this country, particularly during the Christmas season." *Id.* Because the nativity was "part of a broader national tradition" and is "a central piece of a longstanding local cultural practice" during Las Posadas, the court determined it was "consistent with this country's history" and does not violate the Establishment Clause. 1-ER-8.

Plaintiff Gerritsen alone now appeals.

## STANDARD OF REVIEW

This Court "review[s] the district court's denial of a preliminary injunction for abuse of discretion." *Harris v. Muhammad*, 165 F.4th 1345, 1350 (9th Cir. 2026). "Questions of law are reviewed de novo." *Id.* To prevail on a motion for a preliminary injunction, a plaintiff must show that he is "likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* (cleaned up).

## ARGUMENT

### I. Gerritsen is not likely to succeed in showing that the cross and nativity violate the Establishment Clause.

Likelihood of success is "the most important" factor a plaintiff must satisfy to obtain a preliminary injunction. *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). Gerritsen's Establishment Clause claim is meritless for two separate reasons: First, Gerritsen lacks standing. Second, the displays are constitutional under governing Supreme Court precedent.

#### A. Gerritsen lacks standing as an offended observer.

At the outset, Gerritsen lacks standing. While the district court did not address standing, "[f]ederal courts are required sua sponte to examine jurisdictional issues such as standing." *Bernhardt v. County of Los Angeles*, 279 F.3d 862, 868 (9th Cir. 2002).

To establish standing, a plaintiff must demonstrate "injury in fact, causation, and a likelihood that a favorable decision will redress the plaintiff's alleged injury." *Seattle Pacific Univ. v. Ferguson*, 104 F.4th 50, 57 (9th Cir. 2024). A plaintiff must show "an injury that is both 'concrete and particularized,'" *Perry v. Newsom*, 18 F.4th 622, 631 (9th Cir. 2021), a requirement that applies with full force in the Establishment Clause context, *City of Ocala v. Rojas*, 143 S. Ct. 764, 764 (2023) (Gorsuch, J. dissenting in denial of certiorari).

Gerritsen's injuries are based entirely upon his offense at observing a historical display that he perceives as conveying a religious message he dislikes. He asserts he is an "atheist" who "do[es] not believe in God." 1-ER-57. He "observed" the City's "large wooden cross" and "Nativity scene" and declared that the "display offends me and makes me feel excluded as a non-believer." *Id.* Because he intends to "visit the Park regularly," he will be "repeatedly exposed to these symbols," which he views "as a government endorsement of Christianity." *Id.*

But mere offense at viewing religious displays in the public square does not satisfy Article III. In American society, "[a]dults often encounter speech they find disagreeable," but "any time a person experiences a sense of affront from the expression of contrary religious views" does not equate to an Establishment Clause violation.[3] *Town of Greece v. Galloway*, 572 U.S. 565, 589 (2014).

---

[3] Gerritsen apparently takes offense at much of what the government does. He has a lengthy history of litigation—civil and criminal—involving Los Angeles and the federal government. His cases range from claims of government censorship, *Gerritsen v. City of Los Angeles*, No. 25-cv-8760, 2026 WL 1454313, at *1 (C.D. Cal. May 14, 2026), to excessive use of force, *Gerritsen v. L.A. Cnty. Metro. Transp. Auth.*, No. 22-cv-6052, 2023 WL 6627823, at *2 (C.D. Cal. Sep. 21, 2023), to criminal convictions for police-radio jamming, *United States v. Gerritsen*, 571 F.3d 1001, 1004 (9th Cir. 2009), to suing the Mexican Consulate for conspiracy with the FBI. *Gerritsen v. Consulado General de Mexico*, 989 F.2d 340, 342 (9th Cir. 1993). These cases have spawned over 20 decisions from the Central District of California and this Court over the last 40 years. The underlying circumstances of many of these cases occurred in El Pueblo. *See, e.g.*,

The Supreme Court's decision in *Valley Forge Christian College v. Americans United for Separation of Church and State* requires as much. 454 U.S. 464, 473 (1982). There, the government donated surplus property to a religious, nonprofit educational institution. *Id.* at 468. An organization composed of "taxpayer members" sued over the conveyance, arguing that its members "would be deprived of the fair and constitutional use of [their] tax dollar[s]." *Id.* at 469.

The Court found that the taxpayers had not suffered a cognizable injury because they raised merely "abstract questions of wide public significance which amount to generalized grievances." *Id.* at 474 (cleaned up). Allowing injury based on "psychological consequence[s] … produced by observation" of a message with which one disagrees "would convert the judicial process into no more than a vehicle for the vindication of the value interests of concerned bystanders." *Id.* at 473, 485 (cleaned up). Put simply: "hurt feelings differ from legal injury." *Freedom From Religion Found. v. Obama*, 641 F.3d 803, 807 (7th Cir. 2011).

As judges and justices have noted "[f]or decades," offended observer standing is "flatly inconsistent" with *Valley Forge*. *See City of Ocala*, 143 S. Ct. at 766 (Thomas, J., dissenting in denial of certiorari) (collecting cases). Further, offended observer standing has "no basis in law," "risk[s] exceeding the judiciary's limited constitutional mandate," and is "deeply

---

*Gerritsen v. City of Los Angeles*, 994 F.2d 570, 572-73 (9th Cir. 1993) (challenging city's ban on playbill distribution in El Pueblo).

inconsistent" with the Supreme Court's "longstanding principles and precedents." *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 80, 83 (2019) (Gorsuch, J., concurring). Recognizing as much, the Court "has never endorsed the notion that an 'offended observer' may bring an Establishment Clause claim." *City of Ocala*, 143 S. Ct. at 764 (Gorsuch, J., respecting the denial of certiorari). And in *Kennedy*, the Court excoriated the similar concept of the "modified heckler's veto," holding that religious activity cannot be "proscribed based on perceptions or 'discomfort.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534 (2022) (cleaned up).

Moreover, offended observer standing is a creature of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), "invented" by "[l]ower courts … for Establishment Clause cases in the 1970s." *Am. Legion*, 588 U.S. at 84 (Gorsuch, J., concurring). Just as *Lemon* has been declared "a misadventure," so also should this Court reject any theory that allows plaintiffs to "recast[] a generalized grievance about governmental action into an 'I-take-offense' argument for standing[.]" *Am. Legion*, 588 U.S. at 83-84 (Gorsuch, J., concurring); *see also* Joseph C. Davis & Nicholas R. Reaves*, Fruit of the Poisonous* Lemon *Tree: How the Supreme Court Created Offended-Observer Standing, and Why It's Time for It to Go*, 96 Notre Dame L. Rev. Reflection 25, 30-32 (2020).

Because Gerritsen's injuries are admittedly limited to offense, he asserts nothing more than a generalized grievance and he has no cognizable injury under Article III.

### B. The cross and nativity are constitutional under a historical understanding of the Establishment Clause.

Gerritsen's claim also fails because the cross and the nativity are constitutional under the Supreme Court's current Establishment Clause precedent. Under the Court's decision in *Kennedy*, this Court must evaluate Gerritsen's Establishment Clause challenge by determining whether the cross and nativity are comparable to the "historical practices and understandings" of an establishment of religion. 597 U.S. at 535. They are not comparable and are thus constitutional. This is consistent with the Supreme Court's other precedents evaluating history and tradition in Establishment Clause cases, including *American Legion* and *Town of Greece*.

#### 1. The cross and nativity do not bear the historical hallmarks of a religious establishment.

In *Kennedy*, the Supreme Court explained that the previously applied Establishment Clause test announced in *Lemon* was an "ahistorical, atextual" approach that "invited chaos in lower courts" and encouraged courts and plaintiffs alike to "purge" from the public square anything that "partakes of the religious." *Id.* at 523, 534-35. Recognizing the long-standing difficulties with *Lemon*, the Court "abrogated" that test. *Groff v. DeJoy*, 600 U.S. 447, 460 & n.7 (2023). In its place *Kennedy* held "that the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" 597 U.S. at 535 (quoting *Town of Greece*, 572 U.S. at 576).

*Kennedy* explained that the relevant historical practices and understandings that guide the analysis are the "hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Id.* at 537. The point of identifying these hallmarks, *Kennedy's* author had previously explained, was to give guidance "localities and lower courts can rely on," ameliorating the "serious" and "challeng[ing]" work of reconstructing the history from scratch in every case. *Shurtleff v. City of Boston*, 596 U.S. 243, 279, 285 (2022) (Gorsuch, J., concurring); *see also* Stephanie H. Barclay, *The Religion Clauses After* Kennedy v. Bremerton School District, 108 Iowa L. Rev. 2097, 2104-05 (2023) (explaining *Kennedy*'s adoption of the hallmarks).

This hallmarks approach is based on "the precise text of the Constitution." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). "The key phrase—'an establishment of religion'—was readily understandable to founding-era citizens." *Nathan v. Alamo Heights Indep. Sch. Dist.*, 173 F.4th 576, 594 (5th Cir. 2026) (en banc). At the time of the founding, "virtually every American knew from experience what those words meant"—since the "Church of England was established by law in the mother country, nine of the thirteen colonies had established churches on the eve of the Revolution, and about half of the states continued to have some form of official religious establishment when the First Amendment was adopted." Nathan S. Chapman & Michael W. McConnell, *Agreeing to Disagree: How the Establishment Clause Protects Religious Diversity and*

*Freedom of Conscience* 9 (2023); *see also Nathan*, 173 F.4th at 596-601 (summarizing colonial history informing the hallmarks). Thus, courts must assess whether a government action resembles the founding-era understanding of an establishment to determine whether the Establishment Clause prohibits that action.

Based on the historical record, the identified hallmarks are:

1. "the government exerted control over the doctrine and personnel of the established church";
2. "the government mandated attendance in the established church and punished people for failing to participate";
3. "the government punished dissenting churches and individuals for their religious exercise";
4. "the government restricted political participation by dissenters";
5. "the government provided financial support for the established church, often in a way that preferred the established denomination over other churches"; and
6. "the government used the established church to carry out certain civil functions, often by giving the established church a monopoly over a specific function."

*Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring) (citing Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2110-12, 2131 (2003)); *see also Kennedy*, 597 U.S. at 537 n.5 (citing same).

Following *Kennedy*, the federal circuit courts have further explained the application of the hallmarks. The dispositive question is: "Have plaintiffs proven a set of facts that would have historically been understood as

an establishment of religion?" *Nathan*, 173 F.4th at 594 (cleaned up); *see also Firewalker-Fields v. Lee*, 58 F.4th 104, 122 n.7 (4th Cir. 2023) (plaintiffs bear "the burden" of "proving that th[e] facts align with a historically disfavored establishmentarian practice"). Thus, "to prevail on [an] Establishment Clause claim, [the plaintiff] must show that the [defendant's action] resembles one of these hallmarks of religious establishment." *Hilsenrath ex rel. C.H. v. Sch. Dist. of Chathams*, 136 F.4th 484, 491 (3d Cir. 2025). And if the government's action "does not bear any of the hallmarks of religious establishment," the claim fails. *Id.* at 494.

Here, Gerritsen has not met that burden. In the passive display of either the cross or the nativity, there is simply no element of "coercion"—which "was among the foremost hallmarks of religious establishments the framers sought to prohibit." *Kennedy*, 597 U.S. at 537. Neither display forces, or even encourages, Gerritsen to *do* anything—and Gerritsen doesn't allege as much. *See* 1-ER-57, 64, 69, 73. Nor do the displays "punish[] dissenters," "compel financial support for religious institutions," or "compel any [citizen] to engage in formal religious exercise." *Nathan*, 173 F.4th at 601-02. Because the cross and nativity do not resemble a historical hallmark of religious establishment, they are constitutional.

**2. This result is consistent with *American Legion*.**

The cross and nativity are also constitutional under *American Legion*. In *American Legion*, prior to *Kennedy*, the Supreme Court explained how the Establishment Clause applies to "religiously expressive monuments,

symbols, and practices" on government property. 588 U.S. at 30. The case involved a 32-foot Latin cross, erected in 1925, located on government property in Bladensburg, Maryland. *Id.* at 43-44. The government acquired the cross in 1961, and more than 50 years later, the American Humanist Association challenged the cross under *Lemon*, arguing it violated the Establishment Clause. *Id.* at 44-45. The Fourth Circuit agreed, but the Supreme Court reversed, upholding the cross 7-2. *Id.* at 66.

In reaching its conclusion, and even before *Kennedy* abrogated *Lemon* in its entirety, the Court expressly rejected *Lemon*'s applicability to "longstanding monuments, symbols, and practices." *Id.* at 51-52. Instead, "a strong presumption of constitutionality" attaches to established religious monuments and displays. *Id.* at 57.

The Court grounded this presumption in four considerations. First, identifying the "purpose" of "monuments, symbols, or practices that were first established long ago" is "especially difficult," and it would be "inappropriate for courts to compel their removal or termination based on supposition." *Id.* at 52. Second, "as time goes by, the purposes associated with an established monument, symbol, or practice often multiply." *Id.* at 53. Third, "just as the purpose for maintaining a monument, symbol, or practice may evolve, the message conveyed [also] may change over time." *Id.* at 54 (cleaned up). Fourth, "when time's passage imbues a religiously expressive monument, symbol, or practice with this kind of familiarity and historical significance, removing it may no longer appear neutral,

especially to the local community for which it has taken on particular meaning." *Id.* at 56. Instead, "tearing down monuments with religious symbolism and scrubbing away any reference to the divine will strike many as aggressively hostile to religion" and as "evocative, disturbing, and divisive." *Id.*

Based on these considerations, the Court concluded that "[t]he passage of time gives rise to a strong presumption of constitutionality." *Id.* at 57. And the Court identified only one way this "strong" presumption might be overcome: if the religious expression "deliberately disrespected" others. *Id.* at 64.

Thus, as the district court correctly held, under *American Legion*, courts ask two questions: (1) whether a challenged monument or display is "religiously expressive," and (2) whether the challenged monument or display is sufficiently "established." 1-ER-6 If so, the strong presumption of constitutionality attaches and may only be rebutted by demonstrating that the religious expression "deliberately disrespected" others.

Here, both the cross and nativity are constitutional. The cross has historical and cultural elements commemorating the founding of Los Angeles, as well as religious elements, making it religiously expressive. Gerritsen first conceded the cross is longstanding, having first been installed in 1929. Appellant Br. 11. And his argument now that the cross is *not* long-standing because it has been replaced due to weathering, Reply 7-8, is rebutted by *American Legion*, which expressly rejected the lower

court's reasoning that using public funds to maintain the Bladensburg cross violated the Establishment Clause. 588 U.S. at 47. Thus, the cross is presumptively constitutional. Gerritsen fails to rebut that presumption, as he offers no evidence demonstrating that the cross was erected to "deliberately disrespect[]" others. *Id.* at 64. Indeed, Gerritsen acknowledges that the cross was created to commemorate the founding of Los Angeles. Appellant Br. 11.

The nativity is also constitutional, for similar reasons. It is religiously expressive, and it is long established, having been set up around Christmastime going back to at least the mid-1960s. Hanley Decl. ¶ 16. It is therefore presumptively constitutional, and Gerritsen has again provided no evidence that the nativity was erected to "deliberately disrespect" others. Rather, all evidence shows that the nativity, as part of Christmas celebrations, was created to observe an important public and cultural holiday. *See* 1-ER-8 (acknowledging that "the crèche is displayed as a part of Las Posadas, a Christmas tradition that commemorates Mary and Joseph's search for shelter"); Answering Br. 8.

Gerritsen contests little of this. Rather, he attempts to resurrect *Lemon* and its progeny to make his case. He argues that "[t]he cross fails *Lemon* and the endorsement test" because it "lacks comparable secular dilution." Appellant Br. 11-12. And he asserts that the nativity is insufficiently secularized, as it is "unaccompanied by sufficient secular elements like Santa Clause or reindeer." *Id.* at 10 (citing *County of Allegheny*

*v. ACLU*, 492 U.S. 573 (1989), and *Lynch v. Donnelly*, 465 U.S. 668 (1984)).

But *Lemon* is no longer good law.[4] *Am. Legion*, 588 U.S. at 31-32; *Kennedy*, 597 U.S. at 534; *see also Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 887-88 (9th Cir. 2022) (recognizing *Lemon*'s overruling). That means courts are no longer required to divine a monument's secular purpose. It also means that they are liberated from having to apply a "three-plastic animals rule" to Christmas displays. *See* Michael W. McConnell, *Religious Freedom at a Crossroads*, 59 U. Chi. L. Rev. 115, 127 (1992).

Finally, Gerritsen seeks to distinguish the cross (and likely, the nativity) on the ground that it is not a "war-memorial." Appellant Br. 11. But though the monument at issue in *American Legion* was for a war memorial, the holding applies to all "established, religiously expressive monuments, symbols, and practices." *Id.* at 57; *see also id.* at 51 n.16. Indeed, post-*American Legion*, courts have consistently rejected Establishment Clause challenges to a wide array of non-war-memorial monuments, symbols, displays, and ceremonies. *See, e.g.*, *Kondrat'yev v. City of Pensacola*, 949 F.3d 1319, 1331 (11th Cir. 2020) (34-foot Latin cross on public land); *Woodring v. Jackson County*, 986 F.3d 979, 994 (7th Cir. 2021) (crèche on

---

[4] This means that, under *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc), cases relying on *Lemon* and its progeny are likewise overruled. *See, e.g.*, *Trunk v. City of San Diego*, 629 F.3d 1099 (9th Cir. 2011).

government property); *Perrier-Bilbo v. United States*, 954 F.3d 413, 428 (1st Cir. 2020) (naturalization oath with the words "so help me God"); *Freedom From Religion Found. v. County of Lehigh*, 933 F.3d 275, 278 (3d Cir. 2019) (county seal that included a Latin cross).

This Court should do the same and hold that the cross and nativity are constitutional under *American Legion*.

**3. This result is consistent with *Town of Greece*.**

Even without *American Legion*'s presumption, the cross and nativity are constitutional. For displays that aren't entitled to a presumption of constitutionality, *American Legion* confirmed that the question is whether they "fi[t] within the tradition" of religious acknowledgments long followed in this country. 588 U.S. at 63 (plurality) (quoting *Town of Greece*, 572 U.S. at 577). Indeed, the Seventh Circuit has held that when "the presumption of constitutionality does not apply, *American Legion* requires us to analyze [the challenged display] under the historical approach from … *Town of Greece*." *Woodring*, 986 F.3d at 995.

Thus, in *Town of Greece*, the Court upheld a town's nine-year prayer practice because it "fit[] within the tradition long followed" by legislatures across the country. 572 U.S. at 577. And in *Van Orden*, the Supreme Court upheld a Ten Commandments display based on a tradition of *other* acknowledgements of religion, including in the Mayflower Compact, in Thanksgiving proclamations, and in quotes inscribed on federal monuments. *Van Orden v. Perry*, 545 U.S. 677, 685-89 & n.9 (2005); *see also id.*

at 699 (Breyer, J., concurring). Applying this approach, the cross and nativity are constitutional.

Crosses were planted in American soil by the first explorers—a fact illustrated by a sculpture (completed in 1863) on the doors of the U.S. Capitol showing Columbus's crew carrying a cross,[5] and by a painting in the Capitol's Rotunda (placed in 1855) showing De Soto's crew erecting a crucifix on the Mississippi.[6] In the eighteenth and nineteenth centuries large crosses were erected (and still stand) in what is now Grant Park in California in 1782 and Cross Mountain Park in Texas in 1849.[7] After the Civil War—at the time Congress incorporated the First Amendment against the states—crosses commemorating veterans were erected on public land in places like Gettysburg, Pennsylvania (1888).[8] And in 1890,

[5] *Columbus Doors*, Architect of the Capitol, https://perma.cc/MV4M-FC2H.

[6] *Discovery of the Mississippi by De Soto*, Architect of the Capitol, https://perma.cc/P5E4-PMHN.

[7] *San Buenaventura Mission Cross*, The Hist. Marker Database, https://perma.cc/XH37-6XAF; *see also Site of Junípero Serra's Cross*, Cal. Off. of Hist. Pres., https://perma.cc/LXV3-NLGN; *Cross Mountain Park*, City of Fredericksburg Parks & Recreation, https://perma.cc/9V95-2PTW; *Details for Cross Mountain*, Tex. Hist. Sites Comm'n, https://perma.cc/9N9M-6YAJ.

[8] *Irish Brigade*, U.S. Dep't of War, https://perma.cc/2T3T-YWF4.

the Naval Academy commissioned a monument of a cross to memorialize officers who died exploring the Arctic.[9]

Today, crosses appear on government property across the country—from Canby's Cross in Lava Beds National Monument in California; to the World War I & II Memorial Cross in Woodbury, Tennessee; to the Kauhako Crater Cross in Kalaupapa National Historical Park in Hawaii.[10] Outside the D.C. Circuit Courthouse stands "a 24-foot-tall sculpture, depicting, among other things, the Ten Commandments and a cross." *Van Orden*, 545 U.S. at 689. Arlington National Cemetery has the famous Argonne (1923) and Canadian (1927) Crosses. This is just a small sampling of the many cross monuments across the country. Together, these examples demonstrate that the Olvera Street cross fits within a broader tradition acknowledging Christianity through the public display of Latin crosses and is thus constitutional.

The same is true of the nativity. One of the "countless" ways American governments have long acknowledged the role religion plays in the lives of their citizens is by recognizing and celebrating Christmas. *Lynch*, 465

---

[9] *U.S. Naval Academy Cemetery*, U.S. Naval Acad., https://perma.cc/J29Q-2AMQ; *see also Determination of Eligibility Form*, Md. Hist. Trust, https://perma.cc/62V5-DTXM.

[10] *Canby's Cross*, The Hist. Marker Database, https://perma.cc/EX8M-FJDB; *see also Canby's Cross-1873*, Cal. Off. of Hist. Pres., https://perma.cc/U69R-7XQE; *World War I-II Memorial*, The Hist. Marker Database, https://perma.cc/9Z8E-9NFY; *Kauhako Crater Cross*, Nat'l Park Serv., https://perma.cc/2LPD-TYC8.

U.S. at 677. Here, *Lynch* is instructive. In *Lynch*, although Justice O'Connor's concurrence applied the endorsement test, the Court's opinion looked to "what history reveals," upholding a nativity scene because it provided no "greater aid to religion" than other long-accepted practices, like legislative chaplains, references to God in the "national motto" and "Pledge of Allegiance," and government subsidies for the preservation and displays of "religious paintings." 465 U.S. at 673, 676-77, 682.

The Court also specifically noted that Congress and the President had long ago "proclaimed both Christmas and Thanksgiving National Holidays in religious terms" and "by Acts of Congress, it has long been the practice that federal employees are released from duties on these National Holidays." *Id.* at 676. Thus, it was "clear that Government has long recognized—indeed it has subsidized—holidays with religious significance." *Id.* To the Court, the City of Pawtucket's crèche was no different, as the City, "like the Congresses and Presidents … has principally taken note of a significant historical religious event long celebrated in the Western World. The crèche in the display depicts the historical origins of this traditional event long recognized as a National Holiday." *Id.* at 680.

Like the nativity in *Lynch*, the nativity here depicts the origins of Christmas, a public holiday. And the nativity comports with a broader pattern of governmental recognition of religious holidays, including Christmas. It is thus consistent with the Establishment Clause. *See, e.g.*, *Woodring*, 986 F.3d at 997.

## II. Gerritsen does not meet the remaining requirements for a preliminary injunction.

Gerritsen is not entitled to an injunction for additional reasons: he cannot show irreparable harm or that the balance of the equities and the public interest is in his favor. "When the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewel*, 747 F.3d 1073, 1092 (9th Cir. 2014).

***Irreparable harm.*** Gerritsen does not face irreparable harm. While Gerritsen claims that he is suffering a "loss of First Amendment freedoms," and thus irreparable harm, Appellant Br. 12, what he is specifically suffering from are "feelings of exclusion and offense," 1-ER-55. But bystanders' hurt feelings are a far cry from the direct violations of First Amendment freedoms that constitute irreparable harm. Indeed, such offense does not meet even Article III's injury requirement, *supra* Section I.A, much less the stringent requirements of irreparable harm. This is because objections such as Gerritsen's are primarily political, and the proper avenue for relief is not resort to the courts. "[R]ecourse for disagreement and offense does not lie in federal litigation," especially when to obtain redress the "offended viewer may avert his eyes or pursue a political solution" without judicial intervention. *Am. Legion*, 588 U.S. at 88 (Gorsuch, J., concurring) (cleaned up).

***Balance of the equities and the public interest.*** Removing the nativity and cross would substantially harm the public interest in

preserving culture and history. El Pueblo has been preserved as a State Historic Park and a National Historic District specifically to protect its historic and cultural heritage, dating back to the founding of Los Angeles itself. *Los Angeles Plaza Historic District National Register of Historic Places Nomination Form*, Nat'l Archives Catalog, at 6 (1972), https://perma.cc/V2JQ-UAUX. The displays at issue here are a key part of that heritage. One citizen's injured feelings do not outweigh the substantial harm an injunction would inflict by derailing nearly a century of effort to preserve for future generations El Pueblo's reminder of the origins of one of America's great cities.

## CONCLUSION

This Court should affirm the judgment.

Dated: August 24, 2026

Respectfully submitted,

/s/ *Andrea R. Butler*
Andrea R. Butler
*Counsel of Record*
Eric S. Baxter
Daniel L. Chen
Colten L. Stanberry
Richard C. Osborne
The Becket Fund for
Religious Liberty
1919 Pennsylvania Ave. NW,
Suite 400
Washington, DC 20006
(202) 955-0095
*abutler@becketfund.org*

*Counsel for Proposed Intervenor-Defendant*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the requirements of Fed. R. App. P. 32(a)(7) and 29(a)(5) and Circuit Rules 32-1(a) because it has 6,761 words. This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ *Andrea R. Butler*
Andrea R. Butler

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2026, the foregoing brief to was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit through the Court's CM/ECF system. I certify that counsel for Defendants are registered CM/ECF users will be served by the appellate CM/ECF system. I certify that I served the foregoing document on this date by mail for delivery within 3 calendar days to the following unregistered case participant:

Jack Gerritsen
6217 1/2 Palm Avenue
Bell, CA 90201

/s/ *Andrea R. Butler*
Andrea R. Butler